#DS 116588

ORIGINAL

CLERK US DISTRICT COURT
NORTHERN DIST. OF TX
FILED

2019 JUN -3 PM 12: 05

For DEPUTY CLERK

**CAUSE NO. _____**

| | | |
|---|---|---|
| **KRISTOPHER TROTTER,** | § | **IN THE DISTRICT COURT** |
| **Plaintiff,** | § | Northern District of Texas |
| **v.** | § | **DALLAS COUNTY, TEXAS** |
| | § | |
| **CITY OF DALLAS, TEXAS** | § | **319 - CV 1 3 2 7 - KL** |
| **Defendant.** | § | **_____ JUDICIAL DISTRICT** |

<u>**JURY TRIAL DEMANDED**</u>

<u>**PLAINTIFF'S ORIGINAL PETITION**</u>

TO THE HONORABLE JUDGE OF SAID COURT:

Plaintiff Kristopher Trotter brings this cause against Defendant, City of Dallas, Texas ("Dallas"), pursuant to 42 U.S. Code § 1983, and in support thereof would show the Court as follows:

<u>A. Discovery Control Plan</u>

1.    Plaintiff intends to conduct discovery under Level 3 of Texas Rule of Civil Procedure 190.4 because this case involves an abuse of the public trust, overbroad restraint of first amendment protected speech, and malicious criminal and administrative misconduct by a police department.

<u>B. Parties</u>

2.    Plaintiff is an individual who resides in Tarrant County. Plaintiff is a Senior Corporal Police Officer with the Dallas Police Department.

3.     Defendant, City of Dallas, Texas, is a municipality located in Dallas County, Texas. Pursuant to Texas Civil Practice and Remedies Code § 17.024(b), Defendant may be served by serving Rosa A. Rios, City Secretary, at 1500 Marilla Street, Room 5D South, Dallas, Texas 75201-6390.

## C. Jurisdiction

4.     This is a claim brought under Article 42 U.S. Code § 1983 asserting that the Defendant violated Plaintiff's First Amendment right to free speech under the U.S. Constitution. This court has subject-matter jurisdiction over claims that the U.S. Constitution has been violated.

## D. Venue

5.     Venue is proper in Dallas County under Texas Government Code § 554.007(b). The cause of action for this complaint occurred in Dallas County, Texas and Plaintiff is a public employee of a local government entity.

## F. Facts

6.     On August 18, 2018, Senior Corporal Kristopher Trotter received a complaint of harassment from a business owner who owns a LGBT bar in the area of his legal beat responsibility. The bar owner called the Northwest Patrol station, and in a conversation with Sergeant Yvette Caperton, used false statements and hostile and intimidating language to threaten a lawsuit against the department and to state that he would complain to the city councilman responsible for his district about Senior Corporal Trotter's law enforcement efforts. Because the complaint involved political implications and false statements of harassment, Sergeant

Caperton notified Lieutenant Chandra Griffith, the Third Watch Commander, by phone of this complaint, and in turn Lieutenant Griffith notified her supervisor, Major William Griffith, of the complaint by phone. Based on the false complaint by the bar owner, Lieutenant Griffith ordered Senior Corporal Trotter's immediate supervisor Sergeant Jared Pomponio to order Senior Corporal Trotter to leave work early and to be restricted to a station assignment the next day. In a meeting with Sergeant Caperton and Sergeant Pomponio regarding the bar's complaint of harassment, Senior Corporal Trotter protested that he had complied with all policies, that he had not engaged in the actions the bar owner had complained of, and that he engaged solely in law enforcement activity performed in good faith. Senior Corporal Trotter also stated that the meritless complaint was being overblown due to the political influence of the LGBT constituency and its effect on the Northwest Patrol Division's ability to conduct law enforcement operations without regards to special interests. Senior Corporal Trotter protested the accusation of harassment, stating it was the first time he had performed traffic enforcement in that area of Northwest Dallas in the three years that he was assigned to the division. Senior Corporal Trotter requested to take personal time off of work for the next day instead of being placed on restriction due to a false complaint. A formal Internal Affairs administrative inquiry subsequently found no policy or law violation in regards to this bar complaint, supporting Senior Corporal Trotter's statement that he solely adhered to policy as the only officer on his watch to perform a traffic stop on that date.

7.    On August 19, 2018, Senior Corporal Trotter notified Sergeant
Pomponio via text message of his request to meet with Lieutenant Griffith's
supervisor, Major Griffith, to express his concern that he was unable to perform his
job impartially as law and policy requires while working for Lieutenant Griffith, due
to her past statements and actions indicating preferential treatment of the LGBT
community coupled with her overreaction to the false complaint. Lieutenant Griffith
previously told Senior Corporal Trotter that officers under her command were in the
LGBT community to 'make friends', not to perform proactive law enforcement.

8.    On August 20, 2018, Senior Corporal Trotter worked an extra job on
his normal day off-duty. He mentioned the bar complaint to coworkers who in
response stated that '[City Councilman Adam] Medrano runs this place' and 'Leave
them [LGBT constituency] alone if you don't want problems'. Senior Corporal
Trotter briefly spoke to Sergeant Pomponio. Sergeant Pomponio indicated that the
bar complaint would be referred to the Dallas Police Internal Affairs Division for a
formal investigation, yet he could not detail what policy Senior Corporal Trotter was
alleged to have violated aside from the ambiguous 'harassment' claim. Sergeant
Pomponio advised Senior Corporal Trotter that an attempt to speak to Major Griffith
would be of little value, since Major Griffith would likely rely solely on Lieutenant
Griffith's input concerning the complaint. Senior Corporal Trotter felt obstructed in
his ability to utilize his chain of command and created a post that evening to the
Dallas Police Association's Facebook page that included the following comment: "(Is
there anywhere) Where officers abide by the duty prescribed by the code of

conduct and where politics have no bearing on how we treat citizens of different types?".

9.      On August 21, 2018, while off-duty yet concerned of his ability to perform his sworn duty under Lieutenant Griffith without political influence, Senior Corporal Trotter sent an e-mail to the Northwest Station Sergeant, Sergeant Thomas Illingworth, and Sergeant Pomponio in an attempt to be moved from Third Watch as commanded by Lieutenant Griffith to First Watch as commanded by Lieutenant Gil Garza.

10.     On August 22, 2018, Senior Corporal Trotter returned to work and was called into the office of Sergeant Illingworth by Sergeant Albert Wagner. Sergeant Wagner presented a written order prepared by Lieutenant Griffith that ordered Senior Corporal Trotter to not respond to calls for routine police assistance or perform any proactive law enforcement in the area surrounding the bar. Sergeant Wagner also stated that by Lieutenant Griffith's order, Senior Corporal Trotter would likely be removed from the beat that he was responsible for and moved from Sector 520 supervised by Sergeant Pomponio to Sector 550 supervised by Sergeant Edward Trevino. Senior Corporal Trotter, knowing the complaint from the bar was meritless and false, again protested that the issue seemed political. Sergeant Illingworth agreed that it was political by stating that 'it is political', but that Senior Corporal Trotter should follow orders without protest regardless of his concerns for political subversion. When Senior Corporal Trotter asked to speak to Major Griffith

about the matter, Sergeant Wagner stated that neither Lieutenant Griffith nor Major Griffith were able to speak to Senior Corporal Trotter at the time of the meeting to discuss the matter, but Sergeant Wagner affirmed that Major Griffith would likely only respect Lieutenant Griffith's input. Sergeant Wagner stated that Senior Corporal Trotter could be excused from work at that point without being charged personal time. Senior Corporal Trotter accepted the offer.

11.     Upon his return to home, Senior Corporal Trotter felt disbelief about indifference and obstruction he faced in reporting his concerns of political influence to his chain of command. In an attempt to create awareness among his department of the Northwest Division's actions affected by undue political influence, including the lawyers and Dallas Police Association executive board members who access the Dallas Police Association's Facebook page, Senior Corporal Trotter posted the written order to the Facebook page and stated the following: "I got a complaint about a two hour effort to enforce DWIs on my beat. They called the station, lied about my actions, and demanded we stop. Since we [Northwest Third Watch] cater to criminality, and are subservient to political influence (aka compromised), I am being removed from the beat that I spend a lot of effort in developing a relationship with. Sorry, we tried to step up DWI enforcement in light of our officer being killed recently by a drunk driver. Welcome to 5 [Northwest Patrol Division]". Senior Corporal Trotter knew that political subversion of a police function is a matter of public concern, and that he was speaking as a private citizen while at home and in a manner that was not pursuant to his official duties as a sworn officer. Senior Corporal Trotter felt that any embarrassment to the involved parties at the

Northwest Patrol Division was outweighed by the need for the political subversion to be addressed by members of the command staff, members of the Internal Affairs Unit or Public Integrity Unit, Dallas Police Association lawyers or members of the Dallas Police Association executive board, all of whom have access to the Facebook group the post was made to, either directly or indirectly. Additionally, in response to a comment from an officer that recommended Senior Corporal Trotter contact Mothers Against Drunk Driving (MADD), Senior Corporal Trotter stated he would contact both MADD and Councilman Adam Medrano to discuss the political influence at the Northwest Patrol Division directly.

12.    On August 23, 2018, while on a vacation day and not at work, Senior Corporal Trotter received a call from Detective Christine Dreher Bush, who in her official capacity at the time was the sole coordinator for the Dallas Police Department's Employee Support Program in the Personnel Division located at Dallas Police Headquarters. Senior Corporal Trotter and Detective Bush knew one another from Senior Corporal Trotter's participation in the Employee Support Program in 2017. Detective Bush sounded alarmed and upset; she stated to Senior Corporal Trotter that his Facebook post was screenshot by an unknown party and that it was causing embarrassment to the Northwest Patrol Division. She told Senior Corporal Trotter to immediately delete the Facebook post concerning political subversion. Detective Bush then ended the 5 minute conversation by advising Senior Corporal Trotter that she would call him back from a personal phone line not subject to monitoring by the City of Dallas. A short time later, in an 18 minute phone call, Detective Bush called Senior Corporal Trotter from a personal phone. Detective

Bush warned Senior Corporal Trotter that she had been speaking to Lieutenant Griffith and Major Griffith the entire morning about this matter, and that because they were embarrassed by the post, they were going to 'hammer him'. Alarmed, Senior Corporal Trotter asked what 'hammer him' meant. Detective Bush stated that Lieutenant Griffith and Major Griffith planned to place Senior Corporal Trotter into the Employee Support Program with a 'failure to progress' classification as punishment for this embarrassment. She stated that this action would affect any future disciplinary action for his entire career. Detective Bush stated that this action would not be confidential and would cause a negative annotation to be placed in Senior Corporal Trotter's Dallas Police Personnel File that would allow for enhancement of any future disciplinary recommendations and affect his ability to be selected for specialized units or for promotion. Detective Bush stated she may have to hold an intervention meeting between Senior Corporal Trotter, Lieutenant Griffith and Major Griffith, because they were 'furious' and wanted Senior Corporal Trotter gone from the Northwest Division as a result of the Facebook post. Detective Bush stated that other members of the department have been suspended for Facebook posts, but that it would be hard for the Dallas Police Department to interview each person that saw the post to establish any true, non-conjectural harm to the department and to discipline Senior Corporal Trotter through traditional investigative methods in the Internal Affairs Division. Due to her time and experience in Internal Affairs, Detective Bush was aware of both the Pickering balance established by the Supreme Court and the established right of public employees to engage in free speech. Detective Bush finished the conversation by stating she would have to wait to see what Assistant Chief Lonzo Anderson, the

Patrol Bureau Division Chief, would decide to do in response to Senior Corporal Trotter's Facebook post. An open records request by Senior Corporal Trotter in March 2019 revealed an e-mail from Detective Bush to Major Griffith with an attachment for Employee Support Program 'Failure to Progress' documentation on August 23, 2018, which supports Detective Bush's statements that she had been in touch with Senior Corporal Trotter's chain of command that same morning. Additionally, the open records request revealed that on that same day, Major Griffith and his supervisor, Chief Rick Watson, were in agreement to place Senior Corporal Trotter on restricted duty pending a board hearing in the Employee Support Program and that they were to meet with Chief Anderson in person on the same day to plan their response to the Facebook post.

13.     This warning of retaliation for protected speech immediately caused unprecedented emotional distress for Senior Corporal Trotter. Detective Bush warned Senior Corporal Trotter that he was to be retaliated against for engaging in protected speech, and by her previous experience in Internal Affairs, knew of the disciplinary challenge of enforcing the overbroad prior restraint on protected speech put in place by the Dallas Police Department's social media Policy. The same night he was told by Detective Bush that he was to be retaliated against for his Facebook post, Senior Corporal Trotter began taking action to mitigate the harm to his family. The belief that his job was in immediate jeopardy caused Senior Corporal Trotter to seek information from a real estate agent to potentially sell his home for fear of potential foreclosure. Senior Corporal Trotter sought recommendations from multiple coworkers for applying to other police departments, and held serious

conversations with his wife about the uncertainty of his job and the prospect of moving in with her family if he were to be fired. Via a text message to Detective Bush, Senior Corporal Trotter advised her of his option to file a legal complaint in response to any retaliation for his Facebook post and indicated a desire to move to another patrol division to avoid the hostile work environment she warned him he would face at the Northwest Patrol Division. Senior Corporal Trotter began to exhaust his excusable sick leave to organize a potential sale of his house, seek new employment, and avoid the emotional retaliation and hostile agenda of Lieutenant Griffith and Major Griffith. Senior Corporal Trotter utilized excused sick time from August 24, 2018 to August 26, 2018, and returned to work on August 29, 2018.

14.    On August 24, 2018, Senior Corporal Trotter received a phone call from Sergeant Wagner that lasted for more than an hour. In this phone call, Sergeant Wagner repeatedly impressed upon Senior Corporal Trotter the need to 'be a good teammate' and not attempt to appeal or fight against any retaliation to be imminently set forth by members of the Dallas Police Department's command staff. Sergeant Wagner expressed a concern for the future well-being of Senior Corporal Trotter's mental state in relation to the ongoing preparation for retaliation by the Dallas Police Department.

15.    On August 29, 2018, Senior Corporal Trotter returned to work and was called into a conference room by Sergeant Wagner and Lieutenant Griffith. After a short conversation in which both Sergeant Wagner and Lieutenant Griffith indicated

that Senior Corporal Trotter should be prepared to face retaliation from the command staff of the Dallas Police Department and that he should be prepared to 'eat a shit sandwich', Lieutenant Griffith provided Senior Corporal Trotter a memorandum dated August 23, 2018 indicating that as a result of being classified as an Employee Support Program 'Failure to Progress' participant, he would be placed on a non-public contact restricted duty assignment in preparation for an immediate 30 day reassignment. The memorandum also stated that Senior Corporal Trotter was restricted from working any off-duty employment until further notice. The memorandum was signed by Major Griffith. Senior Corporal Trotter was dismissed, sent home and was told by Lieutenant Griffith to report to the Northwest Patrol Division in civilian clothes the next day.

16.    Senior Corporal Trotter realized that the retaliation for his protected speech was set in motion exactly as foretold by Detective Bush, and that Lieutenant Griffith and Major Griffith violated multiple internal departmental policies that were in place to prevent such retaliatory agendas. That evening, Senior Corporal Trotter sent an email to himself via City of Dallas email to document his concerns of multiple policy violations and retaliation. This action was taken to allow for accurate record keeping and recollection in anticipation of utilizing administrative remedies afforded to members of the Dallas Police Department, such as grievances (formal complaints) or internal investigations. Senior Corporal Trotter believed that the Employee Support Program was being misappropriated as a mechanism for retaliation, and that numerous policies were being knowingly violated to engage in retaliation in violation of his civil rights. Despite the attempt of retaliation, Senior

Corporal Trotter was confident that the Employee Support Program as described in policy was independent from agendas and would have to agree with the 'Failure to Progress' designation after reviewing the situation; since the Employee Support Program coordinator Detective Bush was aware of the intent of it being used as retaliation, Detective Bush could elect to void the retaliation attempt since she knew it violated Senior Corporal Trotter's constitutional right to free speech and violated nearly every provision of the Employee Support Program policy.

17.     Having been warned by Detective Bush and Sergeant Wagner of impending retaliation for causing embarrassment to the Northwest Patrol Division, and having seen the first predicted actions being set in motion, Senior Corporal Trotter again utilized excused sick leave to protect himself from further retaliation and to assist with the anxiety that the situation caused for his wife. Senior Corporal Trotter used sick leave from August 30, 2018 until September 12, 2018. Despite providing a note from a doctor to excuse the sick leave on the first day of his return as policy required, the Northwest Patrol Division marked Senior Corporal Trotter's sick time as unexcused both in the electronic time card keeping format and the physical time card, an action that subjected him to potential discipline. Senior Corporal Trotter did not discover this until December 2018. During this time of excused sick leave, Senior Corporal Trotter began to compose a formal complaint against the actions of the Northwest Patrol Division to prevent an unwarranted adverse employment action intended to cause him personal and professional hardship.

18.    On September 10, 2018, Senior Corporal Trotter e-mailed a preliminary copy of his formal grievance to Sergeant Trevino. The grievance highlighted the numerous policy violations that Lieutenant Griffith and Major Griffith had committed in line with the forewarned retaliation. The grievance sought for Senior Corporal Trotter to not be placed into the Employee Support Program, for Senior Corporal Trotter to be immediately removed from restricted duty, for the memorandum issued in violation of policy on August 29, 2018, to be removed from his record, and asked that Senior Corporal Trotter be moved from Third Watch to First Watch to avoid the retaliation and hostile work environment he was warned of. Senior Corporal Trotter had previously been warned by experienced coworkers of the vindictive nature of Lieutenant Griffith, and he anticipated that a successful grievance would invariably come at a cost to his professional standing. Sergeant Trevino met with Sergeant Wagner and Lieutenant Griffith that night to discuss the grievance and plan a response.


19.    On September 12, 2018, Detective Bush of the Employee Support Program called Senior Corporal Trotter and told him to report to Dallas Police Headquarters at attend a meeting. Senior Corporal Trotter believed the meeting to be a mediation session between the Lieutenant Griffith, Major Griffith, and himself in relation to the grievance and asked if he should have legal representation. Detective Bush told Senior Corporal Trotter that the meeting was non disciplinary and no lawyer was necessary. Upon arrival to the meeting, Senior Corporal Trotter

was met by Detective Bush, Sergeant Trevino, and Sergeant Wagner. Detective
Bush had also invited Senior Corporal Debra Taylor and Lieutenant Brian Deininger
to the meeting, who were her personal friends. Detective Bush, to the surprise of
Senior Corporal Trotter, stated that the meeting was about Senior Corporal
Trotter's involuntary selection to the Employee Support Program 'Failure to
Progress' as of August 29, 2018. Detective Bush, the same person who had recently
warned Senior Corporal Trotter of retaliation and had knowledge of the Pickering
balance, was surprisingly dismissive and hostile concerning the grievance that
Senior Corporal Trotter had provided to Sergeant Trevino. Detective Bush stated
that none of the Employee Support Program policies that were being addressed in
the grievance were applicable to Senior Corporal Trotter's mandatory participation,
and that it was 'too late' because Senior Corporal Trotter was already selected into
the program, unbeknownst to him, and that he was provided an assessment period
but that he failed on the first day. Detective Bush read the grievance information
aloud and was noticeably angry about the fact that Senior Corporal Trotter reported
her warning of him 'being hammered' in the grievance. In the presence of all
parties, Detective Bush admitted that she did say that Senior Corporal Trotter
would be hammered, but equivocated about to whom she had referred to that was
to initiate the retaliation. Detective Bush then read aloud an Employee Support
Program 'Supervisory Referral' document created by Lieutenant Griffith and was
comprised of hostile conjecture and false and conflicting statements. When Senior
Corporal Trotter asked to discuss the merits of the referral, he was told in an
exasperated manner by Sergeant Wagner that it could be reviewed in detail at
another date. When Senior Corporal Trotter protested to Sergeant Wagner about

the false statements on the referral, and that the meritless bar complaint that was the catalyst for the Facebook post, Sergeant Wagner stated clearly in front of all attendees that the only reason Senior Corporal Trotter was assigned to the Employee Support Program as a 'Failure to Progress' candidate was because of the bar complaint and the Facebook post. This was a critical statement; having fraudulently signed 'Failure to Progress' documents as Senior Corporal Trotter's immediate supervisor for the August 2018 Employee Support Program 'Failure to Progress' designation, Sergeant Wagner's statement was the most relevant to the cause for the referral while at the same time completely invalidating the misleading memorandum created by Lieutenant Griffith. Detective Bush stated that Lieutenant Griffith refused to attend the meeting to justify, discuss, or defend the false and conflicting information that she placed on the Employee Support Program referral document. Detective Bush immediately became upset as Senior Corporal Trotter began to document in a notebook the inconsistent statements made during the meeting, and left the room by slamming the door in a manner meant to intimidate Senior Corporal Trotter. When she returned, she apologized for her emotional response, yet she continued the meeting by providing a memorandum created and signed by her to Senior Corporal Trotter that, per Chief Anderson, reassigned him to the Property Room until further notice. The memorandum also affirmed that Senior Corporal Trotter would continue to be on no-public contact restricted duty and restricted from working off-duty employment until further notice. The members of the Dallas Police Department party to this retaliatory agenda took careful precaution to not mention the Facebook post in any documentation as a reason for the false referral to the Employee Support Program, and Detective Bush stated to

Senior Corporal Trotter that the Facebook post would not be investigated by Internal Affairs because Major Griffith felt the adverse employment action was potentially too stressful for Senior Corporal Trotter to deal with. Detective Bush, in anger, stated that Chief Anderson could have simply transferred Senior Corporal Trotter to the property room but instead use the Employee Support Program. Senior Corporal Trotter knew that this action was not supportive and that it precluded a transfer grievance. He felt that this was evidence that the Dallas Police Department knowingly and intentionally sought to use falsified statements and documents regarding the Employee Support Program to mask their adverse employment action. Documents attained via an open records request in March 2019 prove that Lieutenant Griffith made conflicting and false statements on a government document, and that this document was utilized to employ the adverse employment action. Detective Bush stated to Senior Corporal Trotter that he would face a board hearing for failing to progress in the Employee Support Program, and that the board would decide what, if any, additional steps would be taken in response to the Northwest Patrol Division's and Detective Bush's joint recommendation that Senior Corporal Trotter had failed to progress. Detective Bush also refused to provide any relevant documentation concerning this adverse employment action to Senior Corporal Trotter at the meeting, including documents that he was required to sign, by protesting that it would take too long to copy the small amount of documents. Detective Bush also stated it was good that Senior Corporal Trotter deleted his Facebook account. Senior Corporal Trotter felt that this was an effort to chill his future engagement in protected speech on social media and also preempt him from contacting MADD, Councilman Medrano, or any other

outside channel to discuss the concern of undue political influence at the Northwest Patrol Division.

20.     Detective Bush, in accordance with an agenda set forth by members of the Dallas Police Department's command staff, knowingly and intentionally misappropriated the Employee Support Program to be used in a retaliatory manner. In violation of 42 USC § 1983, the Dallas Police Department knowingly and maliciously took an materially adverse employment action that is equivalent to a demotion against Senior Corporal Trotter as retaliation for his engagement in protected speech that his chain of command found embarrassing. To mitigate the potential of a lawsuit over this action, the Dallas Police Department maliciously used falsified government documents to justify the adverse employment action and to hide their intent to retaliate against Senior Corporal Trotter for his Facebook post. Senior Corporal Trotter was not only subject to his constitutional rights being violated by the Dallas Police Department, he was victimized by criminal acts that Detective Bush committed in her official capacity and pursuant to her assigned duties as a member of the Dallas Police Department. Records attained via an open records request prove that Detective Bush knowingly made multiple false statements on an Employee Support Program 'Fail to Progress' timeline in an attempt to mischaracterize Senior Corporal Trotter's participation and conduct in the 2017 Employee Support Program as problematic and unsuccessful, despite all documentation that show it was successfully completed without a single concern. This criminal act, discovered in March 2019 from an open records request, was referred to the Dallas Police Department's Public Integrity Unit for a criminal

investigation, which is ongoing at the time of this complaint. Lieutenant Griffith also lied or otherwise mislead her superiors in an e-mail in September 2018 in which she also attempted to mischaracterize Senior Corporal Trotter's participation and conduct in the 2017 Employee Support Program as unsuccessful. The 'Failure to Progress' timeline was falsified, and while both Sergeant Wagner and Lieutenant Griffith knew the information in the timeline was not correct and that Sergeant Wagner was not Senior Corporal Trotter's immediate supervisor in his chain of command, they both failed to review and address this concern prior to escalating their recommendation for an adverse employment action to their superiors.

21.     Senior Corporal Trotter reported to the property room on his next duty day. Due to the no-public contact restricted duty assignment to the property room resulting from the Dallas Police Department's misconduct, Senior Corporal Trotter was stripped of all duties that were integral and material to the role of a police officer. Senior Corporal Trotter was unable to perform as a sworn officer, which he was trained for and was required by law and policy to perform due to his status as a licensed peace officer employed by the Dallas Police Department. Senior Corporal Trotter was unable to wear a police uniform or carry any police equipment aside from his hidden gun while assigned to the property room. As a sworn officer required by law to intervene in life-threatening situations, and considered on duty at all times while in the City of Dallas by policy, Senior Corporal Trotter would be unable to use less than lethal force such as OC spray or a Taser to prevent harm to others if needed. Due to a malicious retaliatory agenda, Senior Corporal Trotter's skills as an officer atrophied; even as the department required Senior Corporal

Trotter to take continuing education and training pursuant to a police officer, such as licensing required training, tactical training, firearm qualifications, etc., it restricted Senior Corporal Trotter to a position equivalent to not only one of a civilian Dallas Police employee, but one with the responsibilities of a clerical assistant that required no specialized training or knowledge. The transfer of Senior Corporal Trotter from a patrol function to the property room is the equivalent of a demotion and was intended to negatively affect his career. It is an objectively worse assignment than that of a patrol officer, and is less prestigious, less interesting, and provides less room for advancement within the department as a sworn officer. It affects his ability to compete for future positions of prestige (Vice Unit, DWI Unit, or Motorcycle Unit) or promote (an oral board for promotion to the next rank, Sergeant, would likely see Senior Corporal Trotter's time restricted to the property room as less than competitive experience needed for a patrol supervisor than for a Senior Corporal that had continued to gain experience and accolades in the patrol function). Senior Corporal Trotter no longer was able to do anything concerning police work and, to his financial detriment, was unable to continue his extra jobs that he enjoyed or participate in other patrol overtime functions that he enjoyed. One month prior to this adverse employment action, pursuant to requirements for his promotion from Police Officer to Senior Corporal, Senior Corporal Trotter agreed to and signed an 'Essential Functions' memorandum that indicated his promotion would entail supervisory and investigative skillsets, among many other skills required to expand upon related to a police officer's promotion. His restriction to the property room stripped Senior Corporal Trotter of his ability to perform his sworn duty, and to ascend to the next level of progressive

function as a Senior Corporal. Senior Corporal Trotter attended Field Training

Officer School in preparation to supervise and train rookie officers only weeks prior

to the adverse employment action, and never was provided the same opportunity

his other newly promoted peers were provided to train or move to lateral

specialized positions as a result of his promotion.


22.   Prior cases filed against the Dallas Police Department in court held

testimony that an involuntary assignment to the property room in response to a

departmental concern is considered a punishment. It is well known to patrol officers

that an involuntary assignment to the property room is routinely a result of

discipline or as a penalty. Senior Corporal Trotter experienced damage to his

reputation as his punitive assignment became known among his coworkers and

other members of the department. Rumors that Senior Corporal Trotter was

assigned to the property room as punishment because he laundered money for a

cartel or had stalked a federal agent began to filter within the patrol bureau, and

Senior Corporal Trotter had to consistently explain his restricted assignment to his

peers that visited the property room. Senior Corporal Trotter was unable to

successfully apply and compete for open positions with Vice, Family Violence, and

Traffic enforcement while falsely subjected to the Employee Support Program, due

to the provisions of the Employee Support Program that preclude transfer to other

positions while in the program.

23.   In an effort to provide evidence that an involuntary transfer to the property room was objectively worse than patrol (and meets the criteria for an adverse employment action), rather that subjectively worse, on May 27, 2019 Senior Corporal Trotter created an electronic poll available to all 1,199 members of the Dallas Police Association's Facebook page. The poll asked if, as sworn officers, officers felt that an involuntary, non-injury-related assignment to the property room was considered a punishment or one that was less prestigious than patrol. The poll offered two options, 'YES' and 'NO'. Of 122 respondents that voted in the first two days of the poll, 114 selected 'YES' while 8 selected 'NO'. 93.4% of respondents, comprised overwhelming of police officers with vast patrol experience and including current supervisor respondents, stated that an involuntary assignment to the property room is punitive or less prestigious than patrol. The Confidence Level of the poll is 95% with N=122 from a population size of 1,199 with a 9% Margin of Error.

24.   While the original memorandum provided to Senior Corporal Trotter by Lieutenant Griffith on August 29, 2018 indicated he would be reassigned to the property room for 30 days, the memorandum provided to Senior Corporal Trotter by Detective Bush stated that per Chief Anderson, Senior Corporal Trotter was assigned to the property room until further notice. Senior Corporal Trotter anticipated that this adverse employment action would be prevented by filing the grievance that he had prepared, and thus immediately provided a physical copy of the finalized grievance to Sergeant Trevino on September 13, 2018. Senior Corporal Trotter had a reasonable expectation that the Dallas Police Department

would adhere to its internal established policies and in good faith continued to work towards a resolution by utilizing administrative remedies.

25.    While assigned to the property room, Senior Corporal Trotter realized that he was likely to return to the Northwest Patrol Division after either the grievance procedure reached its conclusion or after he faced an Employee Support Program Board within 30 days of his assignment to the property room; if the board truly functioned as an entity independent of the retaliation agenda set forth previously, Senior Corporal Trotter reasonably anticipated that he would be released from the Employee Support Program at the board's conclusion since the program was misappropriated in retaliation and in violation of numerous internal policies. Senior Corporal Trotter was notified that Major Griffith, not Lieutenant Griffith, would meet with him to discuss the grievance. Senior Corporal Trotter realized that Lieutenant Griffith continued to avoid her responsibility as required by policy and felt that all future interactions with Lieutenant Griffith were to be contentious at best because of her anger over the Facebook post.  Senior Corporal Trotter elected to withdraw his grievance to avoid the continual retaliation he expected to face and to mitigate the risk to his employment as a Dallas officer. He notified Sergeant Trevino of this intent, and sent a memo to him on September 19, 2018 to withdraw the original grievance.

26.    On October 9, 2018, Senior Corporal Trotter was notified via e-mail of an Internal Affairs Investigation involving the Facebook post. Since Senior Corporal

Trotter was told by Detective Bush at their September 12, 2018 meeting that Major Griffith decided not to request an investigation, yet the investigation request was approved by the Northwest Patrol Division after the grievance was withdrawn, he felt that this action was another act of retaliation in response to his resistance to the initial retaliation efforts. The same day, Senior Corporal Trotter notified Internal Affairs Detective Tramese Jones via e-mail of his concerns of retaliation in regards to the investigation.

27.     While assigned to the property room, Senior Corporal Trotter continued to provide evidence to Detective Bush to counter the false written statements Lieutenant Griffith provided on the Employee Support Documentation. Detective Bush failed to acknowledge or assist with a resolution of Senior Corporal Trotter's concerns of potential false documentation. She also discouraged Senior Corporal Trotter from communicating with her via e-mail since e-mails were subject to open record requests, and stated that she refused to respond to any additional e-mails sent by Senior Corporal Trotter in regards to the adverse employment action. Senior Corporal Trotter anticipated facing the Employee Support Program board within 30 days of his assignment to the program and restriction to the property room. However, Detective Bush failed to initiate the board proceedings during the 9 months of Senior Corporal Trotter's restricted duty, from the first day of the property room assignment to the date of this filing, despite multiple requests to do so. Detective Bush failed to adhere to existing policy concerning the Employee Support Program board, and in multiple statements in person and in e-mail, stated that Senior Corporal Trotter must wait for a new policy revision to face a board.

Detective Bush misled interested parties, from her own supervisors and supervisors at the Northwest Patrol Division, into the belief that no provision was in place for an Employee Support Program participant that 'failed to progress' to face a board, but there was a provision in place already that was ignored. Despite this, she continued to ignore Senior Corporal Trotter's requests that she adhere to policies that she helped to create from the onset of the program. Senior Corporal Trotter lost complete faith in the Dallas Police Department participants to this cause; up to this point, he had been told he would be retaliated against in violation of his civil rights, he was retaliated against in violation of policy facilitated by misrepresentation, and his efforts to compel others to adhere to policy to prevent the retaliation were obstructed by Detective Bush. Detective Bush intended to create new policy revisions to cover her actions prior to convening a 'Failure to Progress' board, and was indifferent to the fact that Senior Corporal Trotter, along with other officers in the same predicament, would be unnecessarily sidelined for months. Detective Bush also intended to present her false statements on government documents to the 'Failure to Progress' board to justify her agreement to the Northwest Patrol Division's agenda, which knowingly would jeopardize Senior Corporal Trotter's career and personal life.

28.    On October 31, 2018, Sergeant Trevino called Senior Corporal Trotter and explained that he was compelled by his supervisor to create a negative performance evaluation. Senior Corporal Trotter explained that his property room supervisor had already filed an evaluation with the Personnel Division in accordance with policy. Despite this, on November 2, 2018, Sergeant Wagner alone visited

Senior Corporal Trotter and his property room supervisor at the property room and presented him a negative performance evaluation that violated numerous policies and was unwarranted. No required commentary was listed on the evaluation, and it was clear that it was a continuation of the retaliation Senior Corporal Trotter had been subjected to up to that point. The evaluation was already signed by Sergeant Trevino and Lieutenant Griffith, but Senior Corporal Trotter refused to sign the evaluation since Sergeant Wagner could not explain the evaluation and a signature by Senior Corporal Trotter would imply a constructive conversation concerning the evaluation had been conducted at the meeting. Sergeant Wagner told Senior Corporal Trotter that Lieutenant Griffith would be angry that Senior Corporal Trotter refused to sign the evaluation. Senior Corporal Trotter asked Sergeant Wagner for three business days to allow for a response; in response, and as evidence that the evaluation was retaliation instead of constructive feedback, Lieutenant Griffith told Sergeant Illingworth to write on the evaluation that Senior Corporal Trotter refused to sign it, and filed the negative evaluation to the Personnel Division two business days after the November 2, 2018 meeting without any effort to speak to Senior Corporal Trotter about the negative evaluation. This is despite policy that states Lieutenant Griffith is responsible for interviewing any subordinate that is assigned a negative evaluation, and that Chief Watson was required to speak to and counsel the subordinate.

29.    On November 16, 2018, Senior Corporal Trotter filed a grievance over the evaluation, contending that one had been filed by the property room in accordance with policy and a retaliatory negative evaluation was filed by the

Northwest Patrol Division to replace it. The Grievance Review Committee heard Senior Corporal Trotter's complaint on December 7, 2018. Senior Corporal Trotter was not notified of the Committee's favorable decision until February 21, 2019, despite the memorandum's date of December 28, 2018. Senior Corporal Trotter met with Chief Anderson on March 4, 2019. Chief Anderson notified Senior Corporal Trotter of his favorable decision to invalidate the retaliatory negative evaluation on April 16, 2019, and stated that he would issue a memorandum to that effect. However, to the date of this filing, Chief Anderson has not provided a memorandum to Senior Corporal Trotter and the negative evaluation remains on file as the official evaluation for the 2018 fiscal year.

30.     On December 20, 2018 the Dallas Police Department's Internal Affairs Division sustained two complaints against Senior Corporal Trotter: violating the social media policy and releasing a departmental record without permission. All members of the chain of command at Northwest Patrol recommended a Written Reprimand as discipline. The Written Reprimand has yet to be issued. It is Senior Corporal Trotter's belief that the Dallas Police Department is aware of his intent to file a complaint in District Court for his civil rights violation and will not discipline him prior to that action to prevent a simultaneous challenge to the overbroad prior restraint on protected speech put in place by the Dallas Police Department's social media policy.

31.     While awaiting the grievance resolution, Senior Corporal Trotter did not speak to Detective Bush after she refused to assist with the evaluation matter and refused to answer any questions via e-mail. She had proven a willingness to ignore policy and was intent on holding Senior Corporal Trotter to restricted duty at the property room for as long as it took to create a more punitive Employee Support Program policy. Detective Bush was indifferent and evasive to any efforts to compel her to hold an Employee Support Program board so that Senior Corporal Trotter could present his evidence that the Dallas Police Department acted to inflict intentional emotional distress upon him. Members of the Northwest Division indicated to Senior Corporal Trotter that Lieutenant Griffith was upset that the hardship was not more severe, and that she desired that he be placed on an overnight shift with undesirable days off of work to further punish him. Senior Corporal Trotter began to seek help from Detective Bush's supervisor, who told Senior Corporal Trotter that he must file an open records request to attain any documentation concerning his 2017 and 2018 participation in the Employee Support Program. Senior Corporal Trotter filed an open records request on February 19, 2019. During this timeframe, Senior Corporal Trotter utilized the bid process and elected to bid for the Dallas Police Central Business District. Senior Corporal Trotter notified his new supervision at the Central Business District Division of his status by e-mail, and spoke to Lieutenant Richard Rivas in person to introduce himself and provide details of his situation. Lieutenant Rivas indicated he would speak to Chief Anderson to hopefully accelerate Senior Corporal Trotter's release from his punitive indefinite assignment. Lieutenant Rivas also sought clarification to Senior Corporal Trotter's status via e-mail, and was told by Detective Bush's supervisor, Cindy

Schoelen, that Senior Corporal Trotter was in limbo while awaiting a new policy for an Employee Support Program board to be implemented.

32.    On March 25, 2019, Senior Corporal Trotter received documents from the open records request that pertained to his participation in the 2017 and 2018 Employee Support Program. Senior Corporal Trotter discovered false statements and conflicting statements on government documents, dishonesty to supervisors in e-mails, and numerous policy violations. He discovered an intentionally falsified 'Failure to Progress' timeline created by Detective Bush, created to support her recommendation that Senior Corporal Trotter failed in the Employee Support Program despite her knowledge that it was employed as retaliation. Senior Corporal Trotter was distraught; he knew from the first day of the meritless complaint to the day he reviewed the open records that there were numerous concerns about the integrity of the actions taken. With the realization that he was subject to falsified documentation, Senior Corporal Trotter was both upset and disheartened and did not return to work until April 1, 2019 after taking time to reconcile this discovery. On April 15, 2019, Senior Corporal Trotter was again obstructed when he attempted to utilize the Employee Support Program policy that allowed him to speak to the Bureau Division Commander, Chief Anderson, about the criminal and administrative concerns over the Employee Support Program. Senior Corporal Trotter received no response from an e-mail sent to Chief Anderson's administrative Lieutenant Michael Dominguez; Lieutenant Dominguez confirmed that he printed the e-mail and left it on Chief Anderson's desk.

33.     On April 8, 2019, Senior Corporal Trotter, with insight gained from the open records request, initiated a grievance against the Employee Support Program and against the actions of Detective Bush that were taken to accommodate the agenda of the Northwest Patrol Division. Lieutenant Irene Alanis confirmed its receipt on April 13, 2019. Two business days after receiving the information concerning numerous policy violations, Senior Corporal Trotter's indefinite and malicious restricted duty assignment, false documentation and documented dishonesty, and the hostile and intimidating actions of Detective Bush, Lieutenant Alanis swiftly suspended the Employee Support Program and removed Detective Bush from her position. Detective Bush was transferred to the Communications Division and is no longer a Detective. Despite these actions that indicated a major concern over the integrity of the situation, Senior Corporal Trotter remained on restricted duty at the property room. On May 17, 2019, Major Alanis (newly promoted from Lieutenant) contacted Senior Corporal Trotter by phone to convey her actions in response to the grievance. Major Alanis indicated that she could not remove Senior Corporal Trotter from the Employee Support Program or from his restricted duty from the property room. Major Alanis stated that decision would have to be made by the Northwest Division chain of command and Chief Anderson, all who were party to the initial retaliation and assignment to the property room and who had shown no remorse or desire to resolve this matter at any point from August 2018 to the date of the conversation with Major Alanis. Major Alanis partially resolved the grievance concerns that were available to act on within her duties, and forwarded the remaining unsolved grievance concerns to the grievance

coordinator, Sergeant Fred Mears. Major Alanis indicated Senior Corporal Trotter would likely still face an Employee Support Program board, despite the numerous concerns of administrative policy violations and potential criminal misconduct that were used to mask a materially adverse employment action.

34.     The new revision to the Employee Support Program policy was released and implemented on April 29, 2019. This policy revision was developed by Detective Bush prior to her reassignment, and served to retroactively permit the actions she took in violation of existing policy on September 12, 2018. It allows for an Employee Support Program board to decide if an employee failed to progress based solely on supervisor recommendations and the ESP recommendations, without the board monitoring the employee for progress as it was required to do so under the previous policy. If the board votes to find that an employee failed to progress, the classification will have an impact on the employee's entire career. The policy now states: "A 'Failure to Progress' classification will be referenced in future administrative investigations and considered by the chain of command on future discipline recommendations to enhance normal progressive discipline recommendations.  It will also be referenced in any Performance Plans and/or Performance Improvement Plans.  This will also include that the selection and 'Failure to Progress' in the ESP will no longer be confidential in nature and will be reflected on the employee's permanent résumé." This new policy would have permitted the retaliatory agenda set in motion by the Northwest Patrol Division (with knowledge by Chief Anderson, who would sit on the board) and the falsified documentation created by Detective Bush to be presented as fact to a board, and

Senior Corporal Trotter, finding no relief to that point, would likely be given a negative annotation on his permanent resume that effectively limits his opportunity for advancement or specialized positions for his entire career. The intent to harm Senior Corporal Trotter through misrepresentation by Lieutenant Griffith and Detective Bush was affirmed. While the Dallas Police Department faced a crisis with understaffing, morale and escalating crime, Detective Bush kept Senior Corporal Trotter at the property room for nearly 10 months while ignoring a policy provision for a board hearing, all to subject him to a much more punitive outcome after a new policy was created.

35.      Having found his attempts to exhaust administrative remedies obstructed, compromised, or otherwise delayed, and having found numerous concerns from the open records request, Senior Corporal Trotter filed complaints with the Dallas Police Department's investigative divisions to investigate his administrative and criminal concerns. It was Senior Corporal Trotter's belief that, as an internal last resort to compel the department to take the appropriate action, these investigative divisions would be immune to the retaliatory agenda set forth by members of the Dallas Police Department in their official capacity. These investigations are ongoing at the time of this filing.

36.      In violation of Senior Corporal Trotter's clearly established first amendment right to free speech, members of the Dallas Police Department told Senior Corporal Trotter he would be retaliated against for his Facebook post.

Members of the Dallas Police Department knowingly employed a materially adverse employment action in retaliation against Senior Corporal Trotter with the malicious intent to create hardship in his personal and work life.  Members of the Dallas Police Department knowingly and intentionally routinely violated their own policies in their pursuit of retaliation. Members of the Dallas Police Department failed to adhere to extant policy and held Senior Corporal Trotter involuntarily at the property room from September 13, 2018 to the date of this filing, in an attempt to hold him accountable for a revision to policy that would further penalize him for his entire career due to false and conflicting statements from Lieutenant Griffith and Detective Bush. It was Detective Bush's intent to present a falsified document to the Employee Support Program board; had the board read the document and took it to be true, it would have the potential to derail Senior Corporal Trotter's entire career as an officer.  Additionally, Lieutenant Griffith intentionally mislead her supervisors as documented in e-mails obtained by open records. Without the courage or tenacity to fight against this malicious retaliation, Senior Corporal Trotter's career would be effectively ruined.

## G. Count 1 – 42 USC § 1983 Claim

37.    Plaintiff repeats and incorporates herein by reference the allegations contained in paragraphs 1 through 35 as if fully set forth here.

38.    Plaintiff, in good faith, reasonably believed that the actions of Lieutenant Chandra Griffith, Major William Griffith, Chief Rick Watson, Chief Lonzo

Anderson and Detective Christine Bush, pursuant to their official capacity, violated the U.S. Constitution. Specifically, Plaintiff believed the conduct of Lieutenant Griffith, Major Griffith, Chief Rick Watson, Chief Lonzo Anderson and Detective Christine Bush violated Article 42 U.S.C. § 1983 and constituted retaliation to punish protected speech and to chill future attempts to engage in protected speech by falsely appropriating an enumerated policy to mask a materially adverse employment action. By intentionally attempting to mask the adverse employment action under the Employee Support Program, these members of the Dallas Police Department knowing created, used, and/or relied on false documentation to facilitate the violation of clearly established protections of the U.S. Constitution. In doing so, the Defendant is not entitled to official qualified immunity for its actions since the actions were clearly not taken in good faith and the actors knew that the right to free speech by a public employee was clearly established.

38.    Plaintiff's participation in protected speech was the cause for the adverse employment action and all other unlawful actions. Defendant attempted to mask this cause through administrative conduct and criminal misrepresentation.

39.    Defendant City's conduct caused injury to Plaintiff, including the loss of reputation, loss of wages, loss of job opportunities and advancement, future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, loss of enjoyment and trust in his employment as a peace officer, and other nonpecuniary losses.

## H. Damages

40.     Plaintiff's professional career and personal life has been irreversibly damaged due to Defendant's unlawful conduct, and he has suffered great physical and emotional pain and damage, mental pain and damage, suffering and anguish, inconvenience, loss of enjoyment of life, and in all reasonable probability will continue to suffer in this manner for an extended time as a result of the Defendant's administrative and criminal misconduct, and its future actions. He and his wife were unable to pursue the adoption of a child due to the uncertainty of continual and escalating retaliation and job stability for over 10 months while he was disenfranchised by the ill-will of the Dallas Police Department. By virtue of utilizing administrative remedies and filing this complaint, he will likely face uncertainty in his career as a Dallas Police officer, based on the previous actions the department employed to harm him.

41.     Plaintiff has suffered lost income and employment benefits, loss of job opportunities, past and future damages to his reputation, as well as loss of earning capacity in the future as a result of having an adverse employment action on his permanent professional employment record and by the attempt of the Dallas Police Department to create a new policy with the intent to further punish Senior Corporal Trotter for his entire career. The proven intent to impact Plaintiff's personal and professional life now and in the future was malicious and irresponsible for a police agency.

42.     Plaintiff is seeking compensatory and punitive damages in an amount of $3,119,000.00.

## I. Attorneys' Fees

43.     Plaintiff seeks reasonable attorneys' fees and court costs, including expert witness costs.

## J. Reinstatement

44.     Plaintiff seeks reinstatement to his former position.

## K. Conditions Precedent

45.     All conditions precedent to Plaintiff's claims for relief have been performed or have occurred.

## L. Request for Disclosure

46.     Under Texas Rule of Civil Procedure 194, Plaintiff requests that Defendant disclose, within fifty (50) days of the service of this request, the information or material described in Rule 194.2.

## M. Documents to be Used

47.     Pursuant to Rules 193.3(d) and 193.7, Plaintiff intends to use all documents exchanged or produced between the parties, including but not limited to, correspondence, disclosures, and discovery responses, during trial of this cause.

## M. Jury Demand

48.     Plaintiff demands a jury trial.

## N. Prayer

49.     For these reasons, Plaintiff asks that Defendant City answer, and that Plaintiff be awarded a judgment against Defendant City for his damages identified above in Section H, prejudgment and post-judgment interest, court costs, attorneys' fees, and all other relief, at law and at equity, to which Plaintiff is entitled. Plaintiff asks that the pending and proposed discipline for his Facebook post be rescinded. Plaintiff asks that all documents from his 2017 and 2018 participation in the Dallas Police Department's Employee Support Program be expunged and destroyed. Plaintiff asks that he be removed from his materially adverse assignment to the property room and from the Employee Support Program and that he be allowed to return to full patrol duty. Plaintiff asks that the Dallas Police Department's social media policy be reviewed for overbroad prior restraint of protected speech in violation of the U.S. Constitution.

Respectfully submitted,

**Kristopher K. Trotter**

PO Box 136845

 Fort Worth, TX 76136

214-714-4747

kristrotter@live.com

**Plaintiff Pro Se**

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

**RECEIVED**

**JUN – 3 2019**

**CLERK U.S. DISTRICT COURT**
**NORTHERN DISTRICT OF TEXAS**

## I. (a) PLAINTIFFS
TROTTER, KRISTOPHER K

## DEFENDANTS
CITY OF DALLAS, TEXAS

**(b)** County of Residence of First Listed Plaintiff     TARRANT
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE:     IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*

Attorneys *(If Known)*

**319 - CV1327 - L**

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

| | | |
|---|---|---|
| ☐ 1 U.S. Government Plaintiff | ☒ 3 Federal Question *(U.S. Government Not a Party)* | |
| ☐ 2 U.S. Government Defendant | ☐ 4 Diversity *(Indicate Citizenship of Parties in Item III)* | |

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff*
*(For Diversity Cases Only)*     *and One Box for Defendant)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☒ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☒ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury - Product Liability | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 376 Qui Tam (31 USC 3729(a)) |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 367 Health Care/ | | | ☐ 400 State Reapportionment |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | Pharmaceutical Personal Injury | | **PROPERTY RIGHTS** | ☐ 410 Antitrust |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | Product Liability | | ☐ 820 Copyrights | ☐ 430 Banks and Banking |
| ☐ 151 Medicare Act | ☐ 340 Marine | ☐ 368 Asbestos Personal Injury Product | | ☐ 830 Patent | ☐ 450 Commerce |
| ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans) | ☐ 345 Marine Product Liability | Liability | | ☐ 835 Patent - Abbreviated New Drug Application | ☐ 460 Deportation |
| | | | | ☐ 840 Trademark | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 370 Other Fraud | **LABOR** | **SOCIAL SECURITY** | ☐ 480 Consumer Credit |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 371 Truth in Lending | ☐ 710 Fair Labor Standards Act | ☐ 861 HIA (1395ff) | ☐ 490 Cable/Sat TV |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 380 Other Personal Property Damage | ☐ 720 Labor/Management Relations | ☐ 862 Black Lung (923) | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 195 Contract Product Liability | | ☐ 385 Property Damage Product Liability | ☐ 740 Railway Labor Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | ☐ 362 Personal Injury - Medical Malpractice | | ☐ 751 Family and Medical Leave Act | ☐ 864 SSID Title XVI | ☐ 891 Agricultural Acts |
| | | | | ☐ 865 RSI (405(g)) | ☐ 893 Environmental Matters |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 790 Other Labor Litigation | **FEDERAL TAX SUITS** | ☐ 895 Freedom of Information Act |
| ☐ 210 Land Condemnation | ☒ 440 Other Civil Rights | **Habeas Corpus:** | ☐ 791 Employee Retirement Income Security Act | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 896 Arbitration |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | ☐ 510 Motions to Vacate Sentence | | | |
| ☐ 240 Torts to Land | ☐ 443 Housing/ Accommodations | ☐ 530 General | | | ☐ 950 Constitutionality of State Statutes |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 535 Death Penalty | **IMMIGRATION** | | |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | **Other:** | ☐ 462 Naturalization Application | | |
| | ☐ 448 Education | ☐ 540 Mandamus & Other | ☐ 465 Other Immigration Actions | | |
| | | ☐ 550 Civil Rights | | | |
| | | ☐ 555 Prison Condition | | | |
| | | ☐ 560 Civil Detainee - Conditions of Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

| | | | | | |
|---|---|---|---|---|---|
| ☒ 1 Original Proceeding | ☐ 2 Removed from State Court | ☐ 3 Remanded from Appellate Court | ☐ 4 Reinstated or Reopened | ☐ 5 Transferred from Another District *(specify)* | ☐ 6 Multidistrict Litigation - Transfer | ☐ 8 Multidistrict Litigation - Direct File |

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
42 USC § 1983

Brief description of cause:
DEFENDANT RETALIATED AGAINST PLAINTIFF FOR ENGAGMENT IN PROTECTED SPEECH

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.

**DEMAND $**
3,119,000.00

CHECK YES only if demanded in complaint:
**JURY DEMAND:** ☒ Yes ☐ No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*     JUDGE _____     DOCKET NUMBER _____

DATE _____     SIGNATURE OF ATTORNEY OF RECORD _____

**FOR OFFICE USE ONLY**

RECEIPT # **110588**     AMOUNT _____     APPLYING IFP _____     JUDGE _____     MAG. JUDGE _____