IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

KRISTOPHER KELLY TROTTER,

     Plaintiff,

v.

CITY OF DALLAS, TEXAS,

     Defendant.

Case No. 3:19-cv-1327-L-BT

## FINDINGS, CONCLUSIONS, AND RECOMMENDATION
## OF THE UNITED STATES MAGISTRATE JUDGE

Before the Court is Defendant the City of Dallas's "Motion to Dismiss Plaintiff's First Amended Complaint," (ECF No. 23), requesting the Court dismiss all of Plaintiff Kristopher Trotter's ("Trotter") claims against it. For the reasons stated, the Court should GRANT Defendant's motion and DISMISS without prejudice Trotter's claims against Defendant the City of Dallas (the "City").

## Background

Plaintiff Kristopher Trotter, a Dallas Police officer, alleges that on August 18, 2018, "a business owner who owns a [sic] LGBT bar in the area of [Trotter's] legal beat responsibility," lodged a false harassment complaint against him. First Am. Compl. 2 (ECF No. 20). As a result, Trotter's "watch commander," Lieutenant Chandra Griffith sent him home early that day and restricted him to station security the next day. *Id.* Trotter objected that the complaint was false and

"overblown because of the political influence of the LGBT constituency." *Id.* On August 20, 2018, Trotter's supervisor, Sergeant Jared Pomponio, informed him the complaint would be referred to the Dallas Police Department's (DPD) Internal Affairs Division for a formal investigation and that "[Trotter's] efforts to speak to his chain of command regarding [Trotter's] concern of political influence would be met with indifference." *Id.* 3. Therefore, once Trotter was home, he posted on the Dallas Police Association's (DPA) Facebook group page to address his concerns. *Id.* This group is comprised of mostly DPD officers and some civilians. *Id.* The post reads:

> Is there anywhere in DPD where morale is good? Where hard work is rewarded and laziness addressed? Where camaraderie exists outside of commiserating before and after detail? Where officers abide by the duty prescribed by the code of conduct and where politics have no bearing on how we treat citizens of different types? Where not every good officer has left, or is making plans to? Where leaders know that if we cannot stand for ourselves, we will not be able to stand for others? Where personal bias and vendettas are not employed in a professional environment?
>
> Please let me know. I want DPD to improve and not rot away while we sit in details mostly empty of bodies and even more empty of motivation or encouragement. The DPD pay issue is of great concern, but it's not the only one to be addressed.
>
> What can we do?

*Id.* 3-4. The post received 76 comments and 25 "likes." *Id.* 4.

Then on August 22, 2018, once Trotter returned to work, Sergeant Albert Wagner presented him with a written order prepared by Lieutenant Griffith,

ordering him "not to respond to calls for routine police assistance or perform any proactive law enforcement in the area surrounding the complaining bar." *Id.* Trotter alleges Sergeant Wagner also stated, "[Trotter] would likely be removed from [his] beat . . . and moved to a different sector and supervisor." *Id.* Trotter "again protested that the issue seemed political," and Sergeant Thomas Illingworth, who was also present at the meeting, "agreed . . . stating that 'it is political,' but that [Trotter] should follow orders without protest regardless of his concerns for political subversion." *Id.* Trotter did not heed this advice, and once he returned home that day, he "posted the written order to the Facebook page in continuation of his August 20, 2018 [Facebook] post." *Id.* This second post stated:

> I got a complaint about a two hour effort to enforce DWIs on my beat. They called the station, lied about my actions, and demanded we stop. Since we [Northwest Third Watch] cater to criminality, and are subservient to political influence (aka compromised), I am being removed from the beat that I spend a lot of effort in developing a relationship with. Sorry, we tried to step up DWI enforcement in light of our officer being killed recently by a drunk driver. Welcome to 5 [Northwest Patrol Division].

*Id.* Trotter alleges multiple people within the DPA Facebook group saw this post and that it "was shared externally by at least one person where it was seen by multiple people outside of the DPA Facebook" group. *Id.* 5.

On August 23, 2018, Detective Christine Dreher Bush, coordinator for the DPD's Employee Support Program, called Trotter and stated that "his Facebook post was screenshot by an unknown party and that it was causing embarrassment

to the Northwest Patrol Division." *Id*. She allegedly "told [Trotter] to immediately delete the Facebook post concerning political subversion because it 'violated policy' and . . . embarrassed his chain of command at the Northwest patrol station." *Id*. Detective Bush then allegedly called Trotter back from her personal phone that was "not subject to monitoring by the Defendant City of Dallas" and told him that "she had been speaking to Lieutenant Griffith and" Lieutenant Griffith's supervisor, and "since they were embarrassed by the post, they were going to 'hammer [Trotter],'" meaning that they "planned to place [Trotter] into the Employee Support Program with a 'failure to progress' classification as punishment." *Id*. 5-6. Bush purportedly told Trotter that this punishment would "cause a negative annotation to be placed in [his] Dallas Police personnel file" that would allow for enhancing future disciplinary action and affect selection for specialized units or promotion. *Id*. 6. As a result, Trotter deleted his post and suspended his Facebook account. *Id*.

On August 24, 2018, Trotter received a call from Sergeant Wagner wherein he "impressed upon [Trotter] the need to 'be a good teammate' and not attempt to appeal or fight against any retaliation to be imminently set forth by members of the [DPD's] command staff in response to [Trotter's] Facebook post." *Id*. Then on August 29, 2018, Sergeant Wagner and Lieutenant Griffith presented Trotter with a memorandum dated August 23 "that indicated he would be placed on a non-public contact restricted duty assignment in preparation for an immediate 30-day reassignment." *Id*. 7. That "memorandum also stated that [Trotter] was restricted

from working any off-duty employment until further notice." *Id.* Next, on September 12, 2018, Detective Bush asked Trotter to attend a meeting at DPD headquarters. *Id.* At that meeting, Trotter received a memo that Chief Anderson reassigned him from patrol duty to the property room until further notice; Sergeant Wagner stated Trotter was reassigned because of the bar's complaint and Trotter's Facebook post. *Id.* Trotter was still not permitted to engage in off-duty employment. *Id.* The next day, Trotter reported to the property room, where he was assigned for nearly a year. *Id.* 8.

Trotter contends this reassignment "affects his ability to compete for future positions of prestige or promotion," and, because he was not permitted to engage in off-duty employment, he "was unable to continue his extra jobs . . . or participate in other patrol overtime functions" to his financial detriment. *Id.* 8-9. To provide tangible evidence of the detrimental effect of "an involuntary transfer to the property room," Trotter created a Facebook poll on May 27, 2019, available to the 1,199 members of the DPA's Facebook group. *Id.* 9. The poll asked whether the officers felt that an involuntary, non-injury-related assignment to the property room was considered a punishment or less prestigious than patrol. *Id.* After the first two days, 114 out of 122 respondents voted "yes." *Id.*

On June 26, 2019, Trotter received a written reprimand for two complaints sustained by the DPD's Internal Affairs Division: "violating the social media policy and releasing a departmental record without permission." *Id.* 10. Trotter appealed

this reprimand, but the hearing on that appeal had not taken place as of January 2, 2020. *Id.*

Trotter contends the DPD's social-media policy, which appears in the DPD Code of Conduct promulgated by the chief of police and the DPD General Orders, "is primarily an overbroad prior restraint on protected speech and is unconstitutional." *Id.* 10-11. Specifically, he alleges DPD Code of Conduct 4.7 provides:

> Employees shall not publicly criticize or ridicule the Department, its policies, or other employees by talking, writing, or expressing in a manner which:
>
> A.   Is defamatory.
>
> B.   Is obscene.
>
> C.   Is unlawful.
>
> D.   Tends to impair the operation of the Department by interfering with its efficiency, by interfering with the ability of supervisors to maintain discipline, or by a reckless disregard for the truth.

*Id.* 15. And DPD General Order 214.04, "Precautions and Prohibitions on Employee Personal Use of Social Media," includes the following:

> Unless contrary to any federal law, state law, or city ordinance, employees shall abide by the following when using social media for personal use:
>
> A.   Employees are free to express themselves as private citizens on social media sites to the degree that their speech and/or language does not impair working relationships of the Department, impede the performance of their duties, impair discipline and

harmony among coworkers, or negatively affect the public perception of the Department.

D.    Employees shall not post speech involving on-duty conduct of themselves or other employees that reflects behavior that would reasonably be considered reckless, irresponsible or would bring discredit to themselves or the Dallas Police Department or City of Dallas.

E.    Employees shall not post speech to social media networks that contain obscene or sexually explicit language, images, acts, statements, or other forms of speech that ridicule, malign, disparage, or otherwise express bias toward any individual or group.

F.    Employees shall not post speech involving themselves or other employees reflecting behavior that maligns, embarrasses, or causes disrepute to the Department.

J.    Employees should expect that any information created, transmitted, downloaded, exchanged, or discussed in a public online forum may be accessed by the Department at any time without prior notice.

*Id.* 15-16.[1] Trotter further alleges that DPD maintained his Facebook posts in an "Employee Support Program file and intended to further retaliate against [him] by over time stockpiling [his] Facebook posts that expressed protected speech, even when [he] was not a selected participant to the program." *Id.* 12. Accordingly, Trotter filed this civil action asserting claims against the City under 42 U.S.C.

---

[1] The Court has reproduced DPD General Order 214.04 as it reads in Trotter's First Amended Complaint, including only subparts A, D, E, F, J.

§ 1983 for alleged violations of his First Amendment right to free speech and his Fourteenth Amendment right to due process.

The City moved to dismiss Trotter's First Amended Complaint under Rule 12(b)(6) for failure to state a claim. Mot. The City's motion is fully briefed and ripe for determination. Resp. (ECF No. 25); Reply (ECF No. 27).

## Legal Standard

When deciding a Rule 12(b)(6) motion for failure to state a claim, the Court "accepts all well-pleaded facts as true, viewing them in the light most favorable to the plaintiff." *In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 205 (5th Cir. 2007) (quotation marks and citation omitted). Therefore, "all questions of fact and any ambiguities in the controlling substantive law must be resolved in the plaintiff's favor"; nonetheless, courts "are not bound to accept as true a legal conclusion couched as a factual allegation." *Covington v. City of Madisonville*, 812 F. App'x 219, 224 (5th Cir. 2020) (per curiam) (internal quotation marks and alterations omitted) (quoting *Lewis v. Fresne*, 252 F.3d 352, 357 (5th Cir. 2001); *Papasan v. Allain*, 478 U.S. 265, 286 (1986)) (citing *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) (recognizing the "tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions")).

"'To survive a motion to dismiss,' [Trotter's] *Monell* pleadings 'must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.'" *Ratliff v. Aransas Cnty.*, 948 F.3d 281, 284-85 (5th Cir. 2020) (quoting *Iqbal*, 556 U.S. at 678). "To be plausible, the complaint's '[f]actual

allegations must be enough to raise a right to relief above the speculative level.'" *In re Great Lakes Dredge & Dock Co. LLC*, 624 F.3d 201, 210 (5th Cir. 2010) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). This pleading standard does not require "detailed factual allegations," but it does demand more than an unadorned accusation devoid of factual support. *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw a reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). "[A] formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555 (citing *Papasan*, 478 U.S. at 286). "While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." *Iqbal*, 556 U.S. at 679. Where the facts do not permit the Court to infer more than the mere possibility of misconduct, the complaint has stopped short of showing that a plaintiff is plausibly entitled to relief. *Id.* at 678 (citing *Twombly*, 550 U.S. at 557).

And applying *Twombly* and *Iqbal*'s plausible-pleading standard to § 1983 municipal-liability cases does not impose a heightened pleading standard. *See Speck v. Wiginton*, 606 F. App'x 733, 735-36 (5th Cir. 2015) (per curiam) (holding the district court did not "err in applying the ordinary pleading standard to failure to train allegations" and "correctly stated that the proper standard was Rule 8 as interpreted by [*Twombly* and *Iqbal*]"); *see also Saenz v. City of El Paso*, 637 F. App'x 828, 832 (5th Cir. 2016) (per curiam) (applying Rule 8 as interpreted by

*Twombly* and *Iqbal* without discussing *Leatherman v. Tarrant Cnty. Narcotics Intel. & Coordination Unit*, 507 U.S. 163, 168 (1993), and affirming dismissal of failure-to-train claim). "Indeed, [Fifth Circuit] precedent[] make[s] clear that the *Twombly* standard applies to municipal liability claims." *Ratliff*, 948 F.3d at 284 (citing *Peña v. City of Rio Grande City*, 879 F.3d 613, 621-22 (5th Cir. 2018); *Doe ex rel. Magee v. Covington Cnty. Sch. Dist. ex rel. Keys*, 675 F.3d 849, 866 n.10 (5th Cir. 2012) (en banc)).

"Regardless of the required proof needed to ultimately prevail on a given claim, when ruling on a Rule 12(b)(6) motion, courts examine the factual allegations of the operative pleading to determine whether asserted claims survive the motion [to dismiss]." *E.G. ex rel. Gonzalez v. Bond*, 2016 WL 8672774, at *5 (N.D. Tex. Sept. 9, 2016) (citing *Groden v. City of Dallas*, 826 F.3d 280, 282-83 (5th Cir. 2016)), *adopted as modified sub nom. E.G. v. Bond,* 2017 WL 129019 (N.D. Tex. Jan. 13, 2017). "In determining whether a plaintiff's claims survive a Rule 12(b)(6) motion to dismiss, the factual information to which the court addresses its inquiry is limited to (1) the facts set forth in the complaint, (2) documents attached to the complaint, and (3) matters of which judicial notice may be taken under Federal Rule of Evidence 201." *Inclusive Communities Project, Inc. v. Lincoln Prop. Co.*, 920 F.3d 890, 900 (5th Cir. 2019) (citing *Norris v. Hearst Tr.*, 500 F.3d 454, 461 n.9 (5th Cir. 2007); *R2 Invs. LDC v. Phillips*, 401 F.3d 638, 640 n.2 (5th Cir. 2005)).

## Analysis

Defendant the City argues Trotter's claims should be dismissed because: (1) "[Trotter] failed to sufficiently plead the existence of an official policy that gives rise to liability under § 1983," since "the chief of police is not the City's final policymaker as a matter of law"; (2) "[Trotter] failed to sufficiently plead the existence of a custom that gives rise to liability under § 1983"; (3) "[Trotter] failed to plead sufficient facts to permit a rational inference of a policymaker's deliberate indifference"; and (4) "[Trotter's] Complaint fails to plead the existence of any constitutional infirmity that invalidates DPD's Code of Conduct 4.7 and General Order 214.04." Mot. 12, 15, 17-18. Trotter responds that: (1) in his First Amended Complaint, he "identified Defendant's social media policy," found in the Dallas Police Department's General Orders and Code of Conduct, "as the official policy invoked by the Defendant to violate [his] constitutional right"; (2) "Defendant expressly and impliedly acknowledges that Chief Hall acts in lieu of the governing body to set goals and structure and design the area of delegated responsibility"; (3) "the complaint clearly shows that Defendant was deliberately indifferent to a known and obvious risk that the City's policies would result in a deprivation of rights"; and (4) "Defendant's social networking policy . . . imposes a significant burden on expressive activity" such that it is an "overbroad prior restraint[] on protected speech and cause[s] protected speech to be subject to discipline." Resp. 6-9. The Court finds Trotter fails to state a claim for municipal liability and addresses each argument in turn.

While § 1983 claims may be brought against municipalities "where . . . the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers," municipalities cannot be held liable solely for employing a tortfeasor; that is, they "cannot be held liable under § 1983 on a *respondeat superior* theory." *Monell v. Dept. of Social Servs.*, 436 U.S. 658, 690-91 (1978); *see also Bd. of Cnty. Comm'rs v. Brown*, 520 U.S. 397, 403 (1997) (citations omitted) ("We have consistently refused to hold municipalities liable under a theory of *respondeat superior*."). This is because "under § 1983, local governments are responsible only for 'their *own* illegal acts.'" *Connick v. Thompson*, 563 U.S. 51, 60 (2011) (Thomas, J.) (emphasis in original) (quoting *Pembaur v. Cincinnati,* 475 U.S. 469, 479 (1986)). And "[t]hey are not vicariously liable under § 1983 for their employees' actions." *Id.* (citations omitted); *see also Pembaur,* 475 U.S. at 479 ("Congress . . . doubt[ed] its constitutional power to impose such liability in order to oblige municipalities to control the conduct of *others*." (emphasis in original) (citation omitted)). Requiring municipal-liability plaintiffs to identify an allegedly unconstitutional municipal policy or custom "ensures that a municipality is held liable only for those deprivations resulting from the decisions of its duly constituted legislative body or of those officials whose acts may fairly be said to be those of the municipality." *Bd. of Cnty. Comm'rs*, 520 U.S. at 403-04 (citing *Monell,* 436 U.S. at 694). "To prevent municipal liability . . . from collapsing into *respondeat superior* liability, a court must carefully test the link between the

policymaker's inadequate decision and the particular injury alleged." *Id.* at 410. Accordingly, "[a]s is generally the case in § 1983 cases, it is far more difficult for [a] plaintiff to establish municipal liability . . . than to establish individual liability." *Ayers v. City of Holly Springs*, 2006 WL 2943295, at *4 (N.D. Miss. Oct. 13, 2006); *see also Jackson ex rel. Martin v. Town of Tutwiler*, 2018 WL 6033596, at *3 (N.D. Miss. Nov. 16, 2018) ("[T]his court acknowledges that federal law does, in fact, make it quite difficult for plaintiffs to recover against municipalities in § 1983 cases."). Though the Court does not require "proof" of any element at the motion-to-dismiss stage, a "plaintiff[ ] must allege facts that support the elements of the cause of action in order to make out a valid claim." *Hale v. King*, 642 F.3d 492, 498 (5th Cir. 2011) (per curiam) (citation and quotation marks omitted); *see also Campbell v. City of San Antonio*, 43 F.3d 973, 975 (5th Cir. 1995) ("However, 'the complaint must contain either direct allegations on every material point necessary to sustain a recovery . . . or contain allegations from which an inference fairly may be drawn that evidence on these material points will be introduced at trial.'" (quoting 5 Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1216 at 156-59 (2d ed.)).

Thus, to state a claim for municipal liability under § 1983, "a plaintiff must show the deprivation of a federally protected right caused by action taken 'pursuant to an official municipal policy.'" *Valle v. City of Houston*, 613 F.3d 536, 541 (5th Cir. 2010) (citing *Monell*, 436 U.S. at 691). "A plaintiff must identify: '(1) an official policy (or custom), of which (2) a policymaker can be charged with actual

or constructive knowledge, and (3) a constitutional violation whose 'moving force' is that policy or custom.'" *Id.* at 541-42. (quoting *Pineda v. City of Houston,* 291 F.3d 325, 328 (5th Cir. 2002)). "[I]solated unconstitutional actions by municipal employees will almost never trigger [municipal] liability." *Piotrowski v. City of Houston*, 237 F.3d 567, 578 (5th Cir. 2001) (citing *Bennett v. City of Slidell*, 728 F.2d 762, 768 n.3 (5th Cir. 1984) (per curiam); *McKee v. City of Rockwall,* 877 F.2d 409, 415 (5th Cir. 1989)).

With respect to the first element, a plaintiff sufficiently alleges an official policy exists by pleading facts that demonstrate:

> (1) a policy statement, ordinance, regulation, or decision . . . [was] officially adopted and promulgated by the municipality's lawmaking officers or by an official to whom the lawmakers have delegated policy-making authority; or (2) a persistent, widespread practice of city officials or employees, which, although not authorized by officially adopted and promulgated policy, is so common and well settled as to constitute a custom that fairly represents a municipal policy.

*Burge v. Saint Tammany Par.*, 336 F.3d 363, 369 (5th Cir. 2003) (quoting *Bennett v. City of Slidell*, 735 F.2d 861, 862 (5th Cir. 1984) (en banc) (per curiam)); *see also Bd. of Cnty. Comm'rs*, 520 U.S. at 404 ("Similarly, an act performed pursuant to a 'custom' that has not been formally approved by an appropriate decisionmaker may fairly subject a municipality to liability on the theory that the relevant practice is so widespread as to have the force of law." (citations omitted)).

Concerning the second element, requiring there be a policymaker with actual or constructive knowledge of the policy, that policymaker must have "the

responsibility for making law or setting policy in any given area of a local government's business." *City of St. Louis v. Praprotnik*, 485 U.S. 112, 125 (1988); *accord Valle*, 613 F.3d at 542. "Municipal liability attaches only where the decisionmaker possesses *final* authority to establish municipal policy with respect to the action ordered." *Pembaur*, 475 U.S. at 481 (emphasis added). Last, regarding the third element that the policy alleged be the "moving force" behind the constitutional violation, a plaintiff must establish that "the municipal action was taken with the requisite degree of culpability and . . . demonstrate a direct causal link between the municipal action and the deprivation of federal rights." *Bd. of Cnty. Comm'rs*, 520 U.S. at 404. The Court first addresses the City's argument that "[Trotter] failed to sufficiently plead the existence of an official policy that gives rise to liability under § 1983," since "the chief of police is not the City's final policymaker as a matter of law."

i.

Trotter's First Amended Complaint fails to adequately allege a policymaker with respect to element two. His allegations are not deficient because he fails to identify a policymaker, but because he affirmatively identifies an individual, the police chief, who is not the City of Dallas's policymaker as a matter of law, absent special delegation. As stated, for municipal liability to attach, a policymaker must have "*final* authority to establish municipal policy with respect to the action ordered." *Pembaur*, 475 U.S. at 481 (emphasis added).

Here, Trotter pleads the "Dallas Police Department's official social media policy is promulgated and overseen by the Chief of Police of the Dallas Police Department. The Chief of Police is delegated policymaking authority from the Dallas City Council, both by conduct and by practice, per the Dallas City Charter." First Am. Compl. 10-11. Trotter cites the City's charter as the source of this policymaking authority, which states:

> The chief of police shall: have immediate direction and control of the police department, subject to the supervision of the city manager, and also subject to such rules, regulations, and orders as the city manager may prescribe, not inconsistent with the ordinances of the city, and shall promulgate all orders, rules, and regulations for government of the police force.

Dallas, Tex., Charter ch. XII, § 2(1); *see also* First Am. Compl. 11 ("The Dallas Police Department's official policies are promulgated by the Chief of Police by authority of Chapter XII, Section 2(1), of the Charter of the City of Dallas, 1907, as amended."). But "[t]his authority. . . does not permit the court to conclude as a matter of law that the Chief of Police is a final policymaker for the City." *Pinedo v. City of Dallas*, 2015 WL 221085, at *5 (N.D. Tex. Jan. 15, 2015) (referring to Dallas, Tex., Charter ch. XII, § 2(1)). Rather, this section of the City's charter indicates the chief of police is subject to the city manager's supervision and does not have final authority to establish municipal policy with respect to police procedures. *See id.* (citing *Webster v. City of Houston*, 735 F.2d 838, 841 (5th Cir. 1984) (en banc) (per curiam)) ("[B]ecause the Chief of Police's authority is subject to supervision by the City Manager, this provision indicates that the Chief of Police does *not* act

16

in lieu of the governing body, subject only to the power of the governing body to control finances and to discharge or curtail the authority of the agent."). This Court has considered this particular language from the City's charter on several occasions "and concluded that the delegation it contains demonstrates that the Chief of Police is *not* the final policymaker for the Dallas Police Department because [she] is at all times subject to the rules and supervision of the City Manager." *Id.* (citing *Mosser v. Haney,* 2005 WL 1421440, at *4 (N.D. Tex. June 17, 2005) (Boyle, J.); *Guzman v. City of Dallas,* 2010 WL 4514369, at *3 (N.D. Tex. Aug. 31, 2010) (Kaplan, J.), *adopted by* 2010 WL 4514364 (N.D. Tex. Nov. 9, 2010) (Boyle, J.); *cf. Flanagan v. City of Dallas,* 48 F. Supp. 3d 941, 950-52 (N.D. Tex. 2014) (Lynn, J.) (recognizing that language in City's charter is insufficient to allege that chief of police is City's final policymaker, but denying motion to dismiss where plaintiff also alleged that member of city council delegated policymaking authority for police-officer training to chief of police)); *see also Hughes v. City of Dallas,* 2020 WL 4670659, at *4 (N.D. Tex. Aug. 11, 2020) (Boyle, J.) (declining to accept FCR "to the extent that it finds that Hughes has alleged a plausible claim of municipal liability against the City of Dallas" where "Hughes's amended complaint lack[ed] . . . factual allegations to show that it is plausible that Chief Brown was a final policymaker"). And the Fifth Circuit recently reiterated that "[a] municipality can be held liable only when it delegates policymaking authority, not when it delegates *decisionmaking* authority." *Longoria ex rel. M.L. v. San Benito Indep. Consol. Sch. Dist.*, 942 F.3d 258, 271 (5th Cir. 2019) (emphasis in original) (*citing Pembaur*,

475 U.S. at 480-81; *Jett v. Dall. Indep. Sch. Dist.*, 7 F.3d 1241, 1246-47 (5th Cir. 1993)). The Court, therefore, concludes that the chief of police is not a final policymaker for the Dallas Police Department as a matter of law.

Trotter contends, however, that Defendant may not "utilize the 'final policymaker' argument to preempt [his] case from proceeding on the facts" because under *Groden*, 826 F.3d at 284, "a 'final policymaker' is not required to be named in a lawsuit." Resp. 11. Trotter is correct that "courts should not 'grant motions to dismiss for failing to plead [a] specific identity'" because the "identity of the policymaker is a legal question." *Peña*, 879 F.3d at 622-23 (brackets in original) (quoting *Groden*, 826 F.3d at 286). And the Fifth Circuit has made clear that "plaintiffs can state a claim for municipal liability as long as they plead sufficient facts to allow the court to reasonably infer that the [policymaker] either adopted a policy that caused [the] injury or delegated to a subordinate officer the authority to adopt such a policy." *Longoria ex rel. M.L.*, 942 F.3d at 271 (citing *Groden*, 826 F.3d at 284, 286). But here, Trotter has not failed to plead a specific policymaker. Rather, he has affirmatively pleaded that the police chief is the City's policymaker responsible for the policy he alleges is unconstitutional. Therefore, Trotter's § 1983 municipal-liability claim fails because the chief of police is not the City of Dallas's policymaker as a matter of law, absent special delegation, and Trotter does not allege the city council delegated policymaking authority to the police chief regarding the social-media policy. *See id.* at 272 ("Without additional allegations that demonstrate Sanchez possessed delegated policymaking authority,

plaintiffs fail to state a claim for municipal liability. Thus, we affirm the district court's dismissal of this claim.").

ii.

Trotter also fails to sufficiently plead that the City has a custom, or unwritten policy, giving rise to municipal liability, and that the City acted with deliberate indifference in perpetuating that policy. The City argues that "[Trotter] provides no facts whatsoever to support his contention that the City had a persistent, widespread practice of violating police officers' First Amendment rights." Mot. 16. Trotter does not respond to this point. *See* Resp.; Reply 3 n.2 ("In both of its motions to dismiss, the City argued that [Trotter] failed to sufficiently plead any unconstitutional custom on which to base a § 1983 claim. [Trotter] did not address this argument in his Response, thereby conceding this point.").

"An official policy 'usually exists in the form of written policy statements, ordinances, or regulations, but may also arise in the form of a widespread practice that is so common and well-settled as to constitute a custom that fairly represents municipal policy.'" *Covington*, 812 F. App'x at 225 (quoting *James v. Harris Cnty.*, 577 F.3d 612, 617 (5th Cir. 2009)). Here, Trotter pleads the DPD's "policies and practices promote an environment of suppression of protected speech and retaliation for protected speech" and that "[o]ther officers who have engaged in protected activity like [Trotter's] legitimate speech have been intimidated, retaliated against, or otherwise have suffered actions that would both suppress and chill future protected speech and discipline or otherwise discourage others from

engaging in protected speech." First Am. Compl. 10. He alleges "[t]his practice is so common and well settled that it constitutes a custom that represents a policy that restricts protected speech, both by actions that preempt such speech before it occurs and punishes such speech after it occurs." *Id*. Trotter further alleges his "case is not an isolated incident of retaliation in response to protected speech; Dallas Police officers have been conditioned over a long period of time to not speak out on matters of public concern and are often hesitant to engage in protected speech in fear of retaliation, discipline, or other career-impacting adverse actions." *Id*. 11. But Trotter alleges no other specific instances describing how the City restricted an officer's speech or retaliated against an officer for that speech to evidence the City's alleged unwritten policy or custom. Accordingly, Trotter fails to plausibly plead a claim against the City based on an unwritten policy or custom. *See Culbertson v. Lykos*, 790 F.3d 608, 629 (5th Cir. 2015) ("The allegations in this case are limited to the events surrounding the plaintiffs. That is not an allegation of a *de facto* policy of retaliation by the County.").

Nonetheless, the City argues "[e]ven if [Trotter] had sufficiently pleaded the existence of an official policy or custom, . . . dismissal of [Trotter's] First Amendment claims is still warranted because [Trotter] . . . failed to plead any facts from which the Court could rationally infer that the final policymaker, the Dallas City Council, was 'deliberately indifferent' to a known or obvious risk that those policies or customs would result in a deprivations [sic] of rights." Mot. 17. Trotter responds that his "complaint clearly shows that Defendant was deliberately

indifferent to a known and obvious risk that the City's policies would result in a deprivation of rights," particularly because the "right against such a sweeping prior restraint on speech in Defendant's policies was clearly established and well-settled at the time of Defendant's implementation of its official policies regulating protected speech and at the time of Defendant's retaliatory adverse employment actions." Resp. 8-9.

"If a plaintiff is able to demonstrate that a municipality promulgated a policy that was unconstitutional on its face, he or she does not also need to prove that the policy was promulgated with knowing disregard for its consequences—knowledge is presumed." *Hobart v. City of Stafford*, 2015 WL 1637876, at *14 (S.D. Tex. Apr. 13, 2015); *see also Covington*, 812 F. App'x at 225 (quoting *Burge*, 336 F.3d at 370) ("Where an official policy or practice is unconstitutional on its face, it necessarily follows that a policymaker was not only aware of the specific policy, but was also aware that a constitutional violation [would] most likely occur."). But where an alleged policy is facially constitutional, "a plaintiff [must] demonstrate that the policy was promulgated or 'implemented with "deliberate indifference" to the "known or obvious consequences" that constitutional violations would result.'" *Covington*, 812 F. App'x at 225 (citing *Alvarez v. City of Brownsville*, 904 F.3d 382, 390 (5th Cir. 2018) (en banc); *Burge*, 336 F.3d at 370). And "[e]stablishing deliberate indifference generally requires a pattern of similar violations arising from a policy so clearly inadequate as to be obviously likely to result in a

constitutional violation." *Id.* (internal quotation marks omitted) (quoting *Burge*, 336 F.3d at 370).

Here, Trotter pleads the City "developed and maintained policies or customs exhibiting deliberate indifference to the constitutional rights of persons in employed [sic] by the Dallas Police Department, which cause[d] the above violations of [his] rights and the rights of his fellow public employees." First Am. Compl. 14. Trotter further alleges the City's "policies and customs demonstrated a deliberate indifference on the part of policymakers of the City of Dallas, Texas to the constitutional rights of persons employed within the City of Dallas, Texas in the Dallas Police Department and were the cause of the violations of [his] rights" and that the City "violated the U.S. Constitution's First Amendment by employing a policy to suppress and penalize protected speech, with deliberate indifference to officers' First Amendment rights." First Am. Compl. 17. As stated, however, Trotter fails to plead any other specific instance in which the City restricted an officer's speech or retaliated against an officer for that speech. Therefore, even if Trotter had stated a claim against the City based on an unwritten policy or custom, he fails to plead sufficient facts to support a pattern of similar violations to permit the Court to infer that the City acted with deliberate indifference in enacting its policy.

### iii.

Trotter alleges the DPD's social-media policy is "an unconstitutional prior restraint on the dissemination of constitutionally protected expression"; is "unconstitutionally overbroad" and "vague"; "chill[s] protected speech"; and is an

"impermissible content-based restriction[] on expression that [does] not further any government interest, substantial, compelling, or otherwise." First Am. Compl. 14. But the City contends that "[Trotter's] constitutional attacks on DPD's Code of Conduct 4.7 and General Order 214.04 . . . fail because they consist of mere legal conclusions, which do not satisfy the pleading requirements discussed in *Iqbal* and *Twombly*," because "[Trotter] . . . summarily declares, without any explanation or factual basis, that the quoted provisions are unconstitutionally vague and overbroad, chill protected speech, impose unconstitutional content-based restrictions on expression, and operate as prior restraints on the dissemination of protected speech." Mot. 18-19. The City does not, however, argue that its policy is constitutional, leaving that issue largely unbriefed. *See* Mot.; Reply.

"While an unconstitutional official policy renders a municipality culpable under § 1983, even a facially innocuous policy will support liability if it was promulgated with deliberate indifference to the 'known or obvious consequences' that constitutional violations would result." *Piotrowski*, 237 F.3d at 579 (citation omitted). Accordingly, "each and any policy which allegedly caused constitutional violations must be specifically identified by a plaintiff, and it must be determined whether each one is facially constitutional or unconstitutional." *Id.* at 579-80. Trotter cites *Liverman v. City of Petersburg*, 844 F.3d 400 (4th Cir. 2016), to support his claim that the DPD's social-media policy is unconstitutional arguing that "the Defendant's Social Media Policy contains provisions nearly identical to

those found unconstitutional in *Liverman*, yet is even more restrictive in a number of aspects." Resp. 10-11.

In *Liverman*, while off duty, two veteran police officers posted comments on Facebook criticizing the City of Petersburg Police Department's practice of promoting "rookie cops" to supervisory and instructing roles. *Id.* at 404-05. Police Chief "Dixon determined that the statements violated the Department's social networking policy and instructed the sergeants to discipline the officers." *Id.* at 405. The disciplinary-action forms provided the comments specifically violated the "Negative Comments Provision," of the social-networking policy, which stated, "[n]egative comments on the internal operations of the Bureau, or specific conduct of supervisors or peers that impacts the public's perception of the department is not protected by the First Amendment free speech clause, in accordance with established case law." *Id.* at 404-05. The Fourth Circuit "not[ed] the astonishing breadth of the social networking policy's language" and held the policy—"a virtual blanket prohibition on all speech critical of the government employer"—regulated "officers' rights to speak on matters of public concern," and the "Department fail[ed] to satisfy its burden of demonstrating  actual disruption to its mission . . . sufficient to justify such sweeping restrictions." *Id.* at 407-09 (citations omitted). The Fourth Circuit remanded the issue of municipal liability to the district court for a "more particularized inquiry into whether Chief Dixon possessed final authority to set policies" regarding officers' speech, having previously concluded Chief Dixon did not have final policymaking authority in light of "a city ordinance

providing that the Chief of Police 'serve[s] at the pleasure of the city manager' and is 'under the direction and control of the city manager.'" *Id*. at 413 (citing *Liverman v. City of Petersburg*, 106 F. Supp. 3d 744, 769 (E.D. Va. 2015)).

Although the Court acknowledges the striking similarity between *Liverman* and Trotter's cases, because Trotter's municipal-liability claim fails on other grounds, the Court does not reach the issue of whether the DPD's social-media policy is constitutional.

iv.

In its motion, the City construes Trotter's First Amended Complaint as asserting claims for intentional infliction of emotional distress, constructive discharge, and a due-process violation. Mot. 19-21. In his Response, however, Trotter states that "Defendant address [sic] 'miscellaneous' claims that are not enumerated in [his] complaint." Resp. 12. Trotter clarifies that his "underlying concerns for due process, the intentional infliction of emotional distress and retaliatory actions pursuit [sic] to the retaliatory agenda, and pretextual falsified government documents that reasonably must be viewed as an attempt at a constructive discharge are not detailed in [his] complaint at this time." *Id*. And "such unpled claims," Trotter states, "are not suitable for dismissal with prejudice until discovery can provide the most accurate insight possible to support [his] pursuit of justice and remedy." *Id*. Because Trotter affirms that he does not presently plead claims apart from his municipal-liability claim, the Court does not construe his First Amended Complaint to assert any other claims.

Trotter states he "has made a convincing argument that discovery will provide necessary evidence to further solidify the facts as laid out in his complaint." *Id*. 13. But "before proceeding to discovery, a plaintiff must plead enough facts to state a plausible claim for relief. *Hernandez v. City of Grand Prairie*, 2018 WL 1836206, at *6 (N.D. Tex. Apr. 18, 2018) (Lindsay, J.) (citing *Iqbal*, 556 U.S. at 678). Because the Court recommends the District Court GRANT Defendant's motion to dismiss, to the extent Trotter requests discovery, the District Court should DENY that request as presently premature.

Last, Trotter "requests an opportunity to amend his complaint with leave granted from the court pursuant to motion Federal Rules of Civil Procedure Rule 15(a)(2) should the court find [his] complaint insufficient in a review of this motion." Resp. 13. The City argues Trotter should not be granted leave to amend because his "pleadings have been the subject of two rounds of dismissal briefing"; he has already alleged his best case; and "allowing [him] to further amend his pleadings would only serve to unnecessarily delay the resolution of this litigation." Reply 11. However, district courts are "entrusted with the discretion to grant or deny a motion to amend and may consider a variety of factors including 'undue delay, bad faith or dilatory motive on the part of the movant, repeated failures to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party . . . , and futility of the amendment.'" *Marucci Sports, L.L.C. v. Nat'l Collegiate Athletic Ass'n*, 751 F.3d 368, 378 (5th Cir. 2014) (quoting *Jones v. Robinson Prop. Grp., LP*, 427 F.3d 987, 994 (5th Cir. 2005)). An amendment is

futile if it could not survive a Rule 12(b)(6) motion. *Id.* (citation omitted). Even so, "[g]enerally a district court errs in dismissing a *pro se* complaint for failure to state a claim under Rule 12(b)(6) without giving the plaintiff an opportunity to amend." *Bazrowx v. Scott*, 136 F.3d 1053, 1054 (5th Cir. 1998) (per curiam) (citing *Moawad v. Childs,* 673 F.2d 850, 851-52 (5th Cir. 1982)). Though Trotter has already amended his complaint once, these findings, conclusions, and recommendation represent his first opportunity to hear what the Court perceives as deficiencies in his pleadings. Accordingly, Trotter's request for leave to amend should be GRANTED, and he should be permitted one final opportunity to plead his case.

## RECOMMENDATION

For the reasons stated, the District Court should GRANT Defendant the City of Dallas's motion to dismiss (ECF No. 23) and DISMISS without prejudice all of Plaintiff Kristopher Trotter's claims against the City. The Court should DENY Trotter's request for discovery and GRANT his request for one final opportunity to amend his complaint.

**SO RECOMMENDED.**

August 14, 2020.

REBECCA RUTHERFORD
UNITED STATES MAGISTRATE JUDGE

## INSTRUCTIONS FOR SERVICE AND
## NOTICE OF RIGHT TO APPEAL/OBJECT

The United States District Clerk is directed to serve a true copy of these findings, conclusions, and recommendation on the parties. Pursuant to Title 28, United States Code, Section 636(b)(1), any party who desires to object to these findings, conclusions, and recommendation must serve and file written objections within 14 days after being served with a copy. A party filing objections must specifically identify those findings, conclusions, or recommendation to which objections are being made. The District Court need not consider frivolous, conclusory, or general objections. A party's failure to file such written objections to these proposed findings, conclusions, and recommendation will bar that party from a *de novo* determination by the District Court. *See Thomas v. Arn*, 474 U.S. 140, 150 (1985). Additionally, any failure to file written objections to the findings, conclusions, and recommendation within 14 days after being served with a copy will bar the aggrieved party from appealing the factual findings and legal conclusions of the Magistrate Judge that are accepted by the District Court, except upon grounds of plain error. *See Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996) (en banc).